UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WAYPOINT TELECOMMUNICATIONS
LLC, a Delaware limited liability company,

       Plaintiff,

                                    File No.  5:05-CV-30

v.

                                    HON. ROBERT HOLMES BELL

CITYNET HOLDINGS, LLC, a Delaware
limited liability company,

       Defendant.

_____/


**O P I N I O N**

     This action for declaratory judgment and for breach of contract is before the Court on

the parties' cross-motions for summary judgment.


**I.**

     Plaintiff Waypoint Telecommunications, LLC, is a Delaware limited liability company

with its principal place of business in East Lansing, Michigan.  Defendant Citynet Holdings,

LLC is a Delaware limited liability company with its principal place of business in

Bridgeport, West Virginia.  Both companies are involved in the business of providing access

to networks of fiber optic filaments ("fibers") used to provide telecommunications products

and services to consumers.  (Compl. & Ans. ¶¶ 3 & 4).

     In the summer of 2003, Citynet and Waypoint began negotiating an agreement under

which Waypoint would assist Citynet in marketing Citynet's fiber optic cables in Phoenix,

Arizona, and Dallas, Texas.   The negotiations culminated in the signing of an Agreement for Grant of IRU ("IRU Agreement") dated December 4, 2003, which purports to grant Waypoint an "indefeasible right of use" ("IRU") in certain fibers owned by Citynet and identified on Exhibit A to the IRU Agreement.

In the spring of 2004, a dispute arose between the parties as to the quantity of the fiber subject to the IRU Agreement, and the validity of the IRU Agreement.  Waypoint contended that it acquired an IRU in all of Citynet's fiber in Phoenix and Dallas.  Citynet contended that the IRU Agreement was invalid because Citynet never agreed to grant Waypoint an interest in any more than half of the fiber in Phoenix and Dallas, and because Citynet's agent did not have authority to enter into a contract for all of the fiber.

Waypoint filed this action against Citynet in February 2005.  In Count I Waypoint seeks a declaration that the IRU Agreement attached to its complaint is a valid and enforceable contract.  In Count II Waypoint seeks damages for breach of contract.  Citynet filed a counterclaim against Waypoint, seeking a declaration that the IRU Agreement is not a valid and enforceable contract.

The parties have filed cross-motions for summary judgment on the issue of whether the IRU Agreement is a valid and enforceable contract.  In the event this Court declares that a contract exists, Waypoint seeks a judgment as to liability only on the issue of Citynet's breach of the contract, and Citynet seeks partial summary judgment on Waypoint's request for damages in the form of lost future profits.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

## III.

The facts relevant to the parties' cross-motions for summary judgment regarding the validity and enforceability of the IRU Agreement are largely undisputed.  Where there are material facts in dispute, the conflicting evidence will be noted.

In the summer of 2003 representatives of Citynet and Waypoint began negotiations regarding the possibility of Waypoint acquiring the right to market fiber optic cables owned by Citynet and located in Phoenix and Dallas.  As a result of these negotiations the parties entered into a Letter of Understanding dated September 2, 2003, outlining the basic terms and conditions of a proposal whereby Citynet would transfer to Waypoint "an indefeasible, exclusive, transferable right to use, for a term of 20 years, 50% of the strands of dark fiber within the pipeline owned by Citynet" in Phoenix and Dallas.  In exchange for the IRU, Waypoint would pay Citynet $100 per fiber per mile of transferred fiber sold by Waypoint, and 50% of the net sales proceeds generated from the sales of the transferred fiber.  The letter was signed by Michael H. Oesterle, Manager of Waypoint, and Duane C. Bennett, Chief Operating Officer, Citynet Ohio, LLC.

Negotiations continued in October and November 2003.  Pete Empie, President of Waypoint, and Duane Bennett of Citynet were the individuals primarily responsible for negotiating the terms of the contract regarding the Phoenix and Dallas fibers.   However, during this time-frame Michael Underdown, who was a regional vice president under Bennett, met with Empie several times and assisted Bennett in finalizing the contract. (Empie Dep. at 32; Underdown Dep. at 35-36, 38, 58).

The law firm of Kirkland & Ellis LLP, represented Waypoint in the negotiations and prepared four drafts of the proposed Agreement for Grant of IRU.  The draft documents are dated October 21, 2003, November 4, 2003, November 14, 2003, and November 26, 2003.

Each of the draft documents contains an Exhibit A, entitled "Identification of Customer Fibers," which states that "The Route(s) (and any end Demarcation Points of any non-ring Route Segments) for the Cable containing the Customer Fibers are as follows." Below this statement is a chart on which the specific number of fibers and route segments are left blank.

In December 2003, Citynet's Bennett and Waypoint's Empie signed an Agreement for Grant of IRU which grants to Waypoint an exclusive and indefeasible right to use the "Customer Fibers" identified on Exhibit A for 25 years. (IRU Agrm't ¶ 2). In consideration for the grant of IRU, Waypoint agreed to pay Citynet $100 per mile of fiber sold or leased, 50% of the net sales proceeds, and 50% of the maintenance revenues generated. (IRU Agrm't ¶ 3). The Agreement had an execution date of December 4, 2003.

Sometime in 2004 a dispute arose as to the quantity of fiber subject to the IRU agreement. Waypoint understood that it had an IRU in all of the fiber in the Phoenix and Dallas networks, while Citynet understood that the IRU was limited to half of the fiber.

The IRU Agreement provided that the fibers were those identified on Exhibit A. Exhibit A is entitled "Identification of Customer Fibers." The Exhibit A that was attached to the IRU Agreement in Citynet's files was left blank. (Ray Dep. at 45). The Exhibit A attached to the IRU Agreement in Waypoint's files identifies the fiber as the "Phoenix Network" and the "Dallas Network."

There are discrepancies in the parties' recollections as to how the IRU Agreement at issue in this case came to be signed, and how Exhibit A with the customer fibers identified

5

came to be attached to Waypoint's copy of the IRU Agreement.  Empie testified that he and Bennett signed the agreement in Chicago, that he did not review Exhibit A before signing the IRU Agreement, and that he does not know what was reflected on Exhibit A when he signed the IRU Agreement.  (Empie Dep. at 88-89).

Bennett denied meeting with Empie to execute the contract.  However, Bennett acknowledged that Exhibit A with the customer fibers identified as the Phoenix and Dallas Networks was part of the IRU Agreement.  (Bennett Dep. at 79).  Bennett believes that he typed Exhibit A and sent it to Mr. Empie along with two additional pages before either he or Empie signed the IRU Agreement.  (Bennett Dep. at 79-80).  Citynet has not produced copies of the other two pages that Bennett asserts he sent to Waypoint.

On December 8, 2003, four days after the IRU Agreement's execution date, Michael Underdown of Citynet sent an email to Empie, directing Empie to "Print page 16." (Underdown Dep. 78, 82).  The page 16 that is identified in Underdown's email is the Exhibit A attached to Waypoint's complaint that identifies the customer fibers as the "Phoenix Network" and the "Dallas Network."  At the top of page 16 is the designation "ESCM" and "Draft 12/3/03."  ESCM refers to Eckert Seamans Cherin & Mellott, the law firm which represented Citynet in connection with the IRU Agreement.  (Underdown Dep. at 78).

Underdown testified that when the parties signed the IRU Agreement, Exhibit A was left blank.  (Underdown Dep. at 82).

6

> [T]hey executed a blank IRU with no information representing anything, and then Pete called me and said, hey, can you put something in there and I said, sure, I'll put in the Phoenix and Dallas networks, and that's how it went.

(Underdown Dep. at 82).  Underdown recalls that he was the one who drafted Exhibit A to identify the Customer Fibers as the "Phoenix Network" and the "Dallas Network." (Underdown Dep. at 80).  According to Underdown, when he sent Exhibit A with the customer fibers identified to Empie, his intention was for Empie to replace the blank Exhibit A that was attached to the signed IRU Agreement with the completed Exhibit A, and for the completed Exhibit A to be made part of the signed IRU Agreement.  (Underdown Dep. at 80-81).  Empie made the replacement as directed.  He substituted the revised Exhibit A transmitted by Underdown for the Exhibit A contained in the IRU Agreement he signed on December 4, 2003.  (Empie Dep. at 95-96).

Notwithstanding these discrepancies in the parties' recollections, there is no dispute that Citynet drafted Exhibit A with the customer fibers identified as the Phoenix and Dallas Networks and sent it to Waypoint with instructions that Waypoint insert it into the executed IRU Agreement.

## A.  Formation of Contract

Citynet contends that the parties never entered into a valid or enforceable contract because there was no meeting of the minds regarding the quantity of fiber that was subject to the agreement.

A federal court sitting in diversity applies the choice-of-law provisions of the forum state. *NILAC Int'l Mktg. Group v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Michigan courts apply a balancing approach consistent with the "most significant relationship" analysis articulated in sections 187 and 188 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS for resolving contract choice-of-law questions. *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 124, 528 N.W.2d 698 (1995); *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002). The parties agree that because the substantive law of the states with the most significant relationships to this IRU Agreement regarding the formation of contracts is largely the same as the substantive law of Michigan, it is appropriate for this Court to apply Michigan law to determine whether a valid, enforceable contract exists between the parties.

The essential elements of a valid contract are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v. Cannon Twp.*, 265 Mich. App. 582, 592, 696 N.W.2d 742, 748 (2005) (quoting *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58 (1991)). With respect to these elements, the only matter at issue is mutuality of agreement, or whether there was a meeting of the minds as to the essential term regarding the quantity of fibers.

"The Michigan courts have adopted and repeatedly reaffirmed the basic tenet of contract law that a 'meeting of the minds' upon all essential points is necessary to constitute a valid contract." *Banque de Depots v. National Bank of Detroit*, 491 F.2d 753, 756 (6th

Cir. 1974) (citing *Professional Facilities Corporation v. Marks*, 373 Mich. 673, 131 N.W.2d 60 (1964); *Fisk v. Fisk*, 328 Mich. 570, 44 N.W.2d 184 (1950)).  Whether or not there is mutual assent or a meeting of the minds is "judge[d] by an objective standard, looking to the expressed words of the parties and their visible acts." *Id.* (quoting *Goldman v. Century Ins. Co.*, 354 Mich. 528, 535, 93 N.W.2d 240, 243 (1958)).

Citynet has moved for summary judgment declaring that the document dated December 4, 2003, and attached to Waypoint's complaint, is unenforceable because it is not the document that was signed on or about December 4, 2003.  Citynet contends that because Exhibit A attached to Waypoint's complaint did not come into existence until four days after the parties executed the IRU Agreement, it does not evidence a meeting of the minds on the essential term regarding the quantity of fiber to be received by Waypoint.

Contrary to Citynet's contentions, the record demonstrates that the document relied upon by Waypoint does evidence a meeting of the minds by the parties on the essential term of the quantity of fiber to be received by Waypoint.  The parties intended to enter into a contract.  They intended that the fibers subject to the contract would be identified in Exhibit A.  The evidence is unrebutted that Citynet intended Exhibit A identifying the fiber as the Phoenix and Dallas networks to be included in the contract and that Waypoint accepted it as such.

The parties' post-signing conduct also confirms their intent to be bound by the terms of the IRU Agreement.  After the IRU Agreement was signed Citynet was aware of

Waypoint's efforts in marketing the Phoenix and Dallas fibers and requested status updates on those sales efforts from Waypoint. (Underdown Dep. at 88-96; Martin Dep. at 126, 130, 136-37). Citynet also introduced Waypoint to potential customers in the Phoenix and Dallas markets. In January 2004, Robert Barklay of Citynet sent emails to Empie, introducing Empie to two potential customers, CWIE and KMC. Barklay advised that the potential customers were "interested in our fiber footprint in Phoenix," and advised the potential customers that Empie's company "represents our marketable assets in Phoenix." (Pl. Ex. 17 & 18).

Notwithstanding the existence of the signed written agreement and the conduct evidencing a contract, Citynet contends that Exhibit A did not mean what it said. Citynet contends that neither Bennett nor Underdown ever intended to contract for more than half the fiber in their networks in Phoenix or Dallas. Citynet points to evidence that on November 20, 2003, subsequent to his meeting with Empie, Bennett emailed Citynet's counsel and confirmed that negotiations had been finalized regarding the sale of 50% of the fiber assets. Bennett testified that he only asked for and received authority from his boss to sell half of the fiber assets. (Bennett Dep. at 116-17). Underdown testified that although Exhibit A did not say 50% of the network, 50% was implied because it had always been intended as half the network. (Pl. Ex. 5, Underdown Dep. at 79).[1] Waypoint, on the other

---

[1]As additional evidence of the lack of mutuality of agreement as to quantity, Citynet points to an email sent by Mr. McLravy, Chief Executive Officer of Waypoint, to Underdown in September 2004, acknowledging that "as to Dallas and Phoenix, Waypoint has an IRU in

hand, contends that the language of Exhibit A is consistent with Citynet's agreement to give Waypoint 100% of the Phoenix and Dallas fiber assets in exchange for half of the maintenance fees to be earned on the sale of fiber to third parties. (Empie Dep. at 70-72).[2]

Based upon the conflicting evidence presented by the parties concerning their subjective intentions, it appears that Citynet's chief concern with Exhibit A is not whether it was intended to be part of the contract, but whether Exhibit A means what it says.

Here there is no question that the parties intended to enter into a contract. "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Marlo Beauty Supply, Inc. v. Farmers Ins. Group of Cos.*, 227 Mich. App. 309, 317, 575 N.W. 2d 324 (1998) (citing *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 194 Mich. App. 543, 548, 487 N.W.2d 499 (1992). It is generally understood that parol evidence may be admitted to show the nonexistence of a contract, but it cannot be admitted to change a writing. *Tepsich v. Howe Constr. Co.*, 377 Mich. 18, 23, 138 N.W.2d 376 (1965). For example, oral evidence is admissible to show that the writing was a sham not intended to create legal relations. *Id.*

---

half of that fiber." (Docket # 44 Ex. A; McLravy Dep. at 16-17). This evidence is inadmissible because it was part of the parties' settlement negotiations. *See* FED. R. EVID. 408.

[2]Both of these provisions differed from the Letter of Understanding. The Letter of Understanding limited the fiber to 50% of the Phoenix and Dallas Networks and made no provision for Citynet's receipt of maintenance fees.

In light of the fact that the quantity term was in writing and made a part of the contract, the conflicting evidence regarding the parties' subjective intent cannot be considered by the Court.

Whether the entire IRU Agreement, including completed Exhibit A, was fully assembled at the time it was signed, or whether Exhibit A was substituted into the IRU Agreement shortly thereafter, is irrelevant to the issue of the formation of a contract. Based upon the existence of the signed IRU Agreement, Citynet's admission that it drafted and provided Exhibit A four days after the effective date of the contract with the intention that it become a part of the contract, and the parties' post-signing conduct, the Court is satisfied that a there was a meeting of the minds as to all essential contract terms, including the quantity of fiber at issue.

## B.  Statute of Frauds

Even if there was a meeting of the minds, Citynet contends that the contract cannot be enforced because there was no writing sufficient to satisfy the Michigan statute of frauds[3] because Waypoint "cannot prove that, at the time it was executed, the purported IRU Agreement granted Waypoint the right to sell 100% of Citynet's Dallas and Phoenix fiber assets." (Citynet Mem. in Opp. at 3).

---

[3]The Michigan statute of frauds provides that an agreement that is not to be performed within one year from the making of the agreement must be in writing and signed by the party to be charged with the agreement.  M.C.L. § 566.132(1)(a).

12

"The statute of frauds is an affirmative defense which generally is waived if not raised as a defense in the pleadings." *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 547 (6th Cir. 1981) (citing FED. R. CIV. P. 8(c)). Citynet did not plead the statute of frauds as an affirmative defense in its answer to Waypoint's complaint and accordingly has waived this defense.

Even if this defense had been properly preserved, it lacks merit. Citynet's argument is premised on the erroneous assumption that to satisfy the statute of frauds the writing must be complete as to all essential terms at the time it was signed. The case law does not support Citynet's assumption. Nothing in the statute of frauds precludes an essential term being in a separate or later document. The Michigan Supreme Court has declined to adopt "narrow and rigid rules for compliance with the statute of frauds." *Forge v. Smith*, 458 Mich. 198, 206, 580 N.W.2d 876, 881 (1998). "Some note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found . . . ." *Id.* (quoting *Goslin v. Goslin*, 369 Mich. 372, 376, 120 N.W.2d 242 (1963)). If one writing references another instrument for additional contract terms, the two writings can be read together to satisfy the statute of frauds. *Id.* at 207.

In this case both parties signed an agreement that referenced Exhibit A for the essential quantity term. Citynet supplied Waypoint with Exhibit A four days after the initial contract was signed. Waypoint did not object to Exhibit A as drafted and supplied by

Citynet.  Because Citynet itself drafted and sent Exhibit A to Waypoint for inclusion in the contract, Citynet cannot be heard to complain about the lack of a writing referencing the quantity term.

## C.  Best Evidence Rule

Citynet contends that the document relied on by Waypoint is not admissible because it does not meet the best evidence rule codified in Rule 1002 of the Federal Rules of Evidence.  This rule provides that to prove the content of a writing, the original writing is required.  FED. R. CIV. P. 1002.  An "original" of a writing is defined by the Rules of Evidence as the writing itself "or any counterpart intended to have the same effect by a person executing or issuing it."  FED. R. CIV. P. 1001(3).

There is no question that Citynet drafted and sent the completed Exhibit A to Waypoint with the intention that it be attached to the IRU Agreement and that it replace the Exhibit A that was attached to the IRU Agreement when it was signed.  Waypoint's IRU Agreement does not constitute an "altered" version of the Agreement executed by the parties. In contrast to the facts in *Boswell v. Jasperson*, 266 F. Supp. 2d 1314 (D. Utah), the case on which Citynet relies, Exhibit A was not "altered" by the proponent of the document.  Instead, the "alteration" was made by Citynet in order to complete or correct the version of Exhibit A that was attached to the original IRU Agreement.

Furthermore, the fact that the IRU Agreement in Citynet's files did not contain the completed Exhibit A does not mean that there were two conflicting original documents.

Based upon Underdown's email and testimony, it is clear that he sent Exhibit A to Waypoint as a substitution of the original Exhibit A.  Citynet's failure to make the same substitution on its own copy of the IRU Agreement does not raise a question as to the authenticity of Waypoint's IRU Agreement.

There is no genuine issue of authenticity regarding the IRU Agreement attached to Waypoint's complaint.  The IRU Agreement relied upon by Waypoint meets the best evidence rule and would be admissible at trial.

## D.  Construction of Contract

The IRU Agreement provides that it "shall be construed under and in accordance with the laws of the State of Delaware."  (IRU Agrm't ¶ 13.8).  Accordingly, Delaware law controls issues relating to the construction of the contract.

Under Delaware law extrinsic evidence cannot be used to interpret contract language where that language is "plain and clear on its face." *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* 693 A.2d 1059, 1061 (Del. 1997). Contract language is not ambiguous simply because the parties disagree on its meaning. "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. *Id.*  If an instrument is clear and unambiguous on its face, the court may not consider parol evidence "to interpret it or search for the parties' intent [ions] . . . ."  *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) (quoting *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del. 1983)).

15

Citynet acknowledges that Exhibit A identifies the fiber as the Phoenix Network and the Dallas Network.  Citynet does not contend that the language of Exhibit A is ambiguous, that it is fairly susceptible to different interpretations, or that it could reasonably be interpreted to identify 50% of the fiber in Phoenix and Dallas.  Instead, Citynet contends that despite the language of Exhibit A, from the time they entered into the Letter of Understanding, the parties always understood that they were referring to only 50% of the fiber in those two networks and that based upon their communications it was "implied" that it was half the networks.  (Underdown Dep. at 79).

Because there is no dispute about the plain meaning of Exhibit A, the parol evidence on which Citynet relies in support of its 50% argument, such as the Letter of Understanding, internal emails within Citynet, and deposition testimony about what Bennett or Underdown subjectively intended, is irrelevant and inadmissible.  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."  *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (1992). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Id.*

Because the plain meaning of Exhibit A refers to the Phoenix and Dallas networks in their entirety, the Court is not permitted to go outside the contract to construe the meaning of Exhibit A.

**E.  Bennett's Authority**

Finally, Citynet contends that the IRU Agreement is not valid because Bennett did not have authority to sell all of the fiber in Phoenix and Dallas.

Bennett signed the IRU Agreement on behalf of Citynet.  Bennett was an agent of Citynet.  "The authority of an agent to bind the principal may be either actual or apparent." *Meretta v. Peach*, 195 Mich. App. 695, 698, 491 N.W.2d 278, 280 (1992). "Actual authority may be express or implied. Implied authority is the authority which an agent believes he possesses." *Id.*

Waypoint contends that Bennett had express, implied, and apparent authority to enter into the IRU Agreement.  Waypoint has presented evidence that Bennett had actual express and implied authority to enter into an IRU Agreement with Waypoint concerning the Phoenix and Dallas fibers.  Citynet does not refute this evidence, but contends that Bennett's authority was limited to a contract for half of the fiber in Phoenix and Dallas, and that Bennett never received express or implied authority from James Martin, the President and Chief Executive Officer of Citynet, to enter into an agreement with respect to all of the fiber in Phoenix and Dallas.

There are questions of fact in the present record that preclude this Court from finding, as a matter of law, that Bennett had actual authority to enter into an IRU Agreement for all of Citynet's fiber in Phoenix and Dallas.  Instead, the Court will focus on the issue of whether Bennett had apparent authority to enter into the IRU Agreement for all of the fiber.

17

> Apparent authority may arise when acts and appearances lead a third person reasonably to believe that an agency relationship exists. Apparent authority must be traceable to the principal and cannot be established by the acts and conduct of the agent. In determining whether an agent possesses apparent authority to perform a particular act, the court must look to all surrounding facts and circumstances.

*Meretta v. Peach*, 195 Mich. App. 695, 698-99, 491 N.W.2d 278, 280 (1992) (citations omitted).

There is no question that Citynet held out Bennett as its agent for purposes of negotiating an IRU Agreement. Bennett signed the Letter of Understanding between Citynet and Waypoint regarding the Phoenix and Dallas fibers and he had previously signed a Letter of Understanding with Waypoint regarding Citynet's assets in Chicago. Martin acknowledged that Bennett was the Chief Operating Officer of the CLEC division of Citynet and that he was responsible for marketing the fiber in Phoenix and Dallas. (Martin Dep. at 45 & 71). Martin also acknowledged that he told Empie to work with Bennett to explore opportunities between Waypoint and Citynet and that Bennett was the point person for Citynet in regard to Waypoint's relationship with Citynet. (Martin Dep. at 91). Bennett provided Martin with draft copies of the IRU Agreement before it was signed. The IRU Agreement contained a provision representing and warranting that the person executing the agreement had authority to enter into the contract on behalf of Citynet. See IRU Agreement ¶ 7.1 Common Representations. ("Each of the Parties represents and warrants . . . that the person executing this Agreement on behalf of each party has the authority to enter into this Agreement and bind the respective party to the terms and conditions contained herein and

that this Agreement is fully enforceable in accordance with its terms.").  Although Bennett signed other contracts on behalf of Citynet, the Waypoint contract is the only agreement in which Citynet has taken the position that the contract is not valid because Bennett did not have authority to enter into the contract.  (Martin Dep. at 74).

In reviewing the question of Bennett's apparent authority, the Court is guided by the following general principles of the law of agency:  (1) the principal is bound to third persons who are not aware of any limitations by the apparent authority given and not by the express authority; (2) the question is not what authority was actually given, but what the plaintiff, in dealing with the agent, was justified in believing the authority to be; (3) parties dealing with an agent have a right to presume that his agency is general and not limited; and  (4) the presumption is that one known to be an agent is dealing within the scope of his authority.

*Maryland Cas. Co. v. Moon*,  231 Mich. 56, 62, 203 N.W. 885, 887 (1925) (quoting *Austrian & Co. v. Springer*, 94 Mich. 343, 54 N.W. 50 (1892)).

> Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal, the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it.

*Moreschini v. Regional Broadcasters of Mich., Inc.*  373 Mich. 496, 498, 129 N.W.2d 859, 860 (1964) (quoting *Maryland Casualty Co. v. Moon*, 231 Mich. 56, 62, 203 N.W. 885, 887 (1925)).

Citynet advised Waypoint that Bennett had authority to negotiate an IRU Agreement of Citynet's fiber assets in Phoenix and Dallas.  There is no evidence in the record to show that Citynet ever informed Waypoint that Bennett's authority was limited to only a portion of the fibers, or to indicate that Waypoint knew or should have known that Bennett's authority was so limited.  Although the Letter of Understanding involved only 50% of the fiber in Phoenix and Dallas, Citynet points to no evidence that would reasonably have alerted Waypoint to an understanding that the quantity of fiber was not negotiable or that Bennett did not have authority to enter into negotiations regarding all of the fiber.  Bennett accordingly had apparent authority to bind Citynet to an IRU Agreement regarding all of the fiber.

The Court concludes that the IRU Agreement attached to Waypoint's complaint is a valid and enforceable agreement that gave Waypoint a 25-year exclusive, indefeasible right of use in Citynet's fiber optic network in Phoenix, Arizona and Dallas, Texas.  Accordingly, Citynet's motion for summary judgment declaring that no contract exists between the parties will be denied and Waypoint's cross-motion for summary judgment declaring that the IRU Agreement is a valid and enforceable contract will be granted.  Judgment will be entered in favor of Waypoint on Count 1 of its complaint, and on Count 1 of Citynet's counterclaim.

## IV.

Waypoint also seeks partial summary judgment as to liability only on Count II of its complaint.  In Count II Waypoint claims that Citynet breached the IRU Agreement because

Citynet repudiated the contract and attempted to sell off a portion of the fiber in violation of Waypoint's exclusive rights.

"Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of performance." *Stoddard v. Manufacturers National Bank of Grand Rapids*, 234 Mich. App 140, 163, 593 N.W.2d 630 (1999). "In determining whether an anticipatory breach has occurred, it is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." *Paul v. Bogle*, 193 Mich. App. 479, 493, 484 N.W.2d 728, 735-36 (1992). A repudiation is generally understood to be

> (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or
> (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981).

With regard to oral repudiation, "a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Paul*, 193 Mich. App. at 494 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 250).

Martin acknowledged in his deposition testimony that in February or March 2004 he told Empie that the IRU Agreement was invalid and not enforceable because Bennett did not have authority to enter into the IRU Agreement or to transfer assets. (Martin Dep. at 143-

45).  Jeffrey Ray, Citynet's General Counsel, also testified that since the summer of 2004 Citynet has taken the position with Waypoint that the entire IRU Agreement is "invalid and unenforceable."  (Ray Dep. at 48).  Furthermore, Underdown told Empie and McLravy in July 2004 that Citynet had sold some of the Phoenix fiber for five million dollars.  (McLravy Dep. at 17-18).

Despite these statements, Citynet contends there is no evidence to support a finding that prior to the institution of this suit, Citynet would not have permitted Waypoint to sell Citynet's Phoenix and Dallas fiber if Waypoint had ever found a buyer.

Citynet's assertion is belied by its actions.  There is no dispute that on December 11, 2003, after the effective date of its IRU Agreement with Waypoint, Citynet entered into an asset purchase agreement with a company called NFiNet which included an agreement to enter into an IRU with NFiNet for 50% of the Phoenix fiber.  (Martin Dep. at 153-54; 159-60; Pl. Ex. 32 & 33).  Citynet received a $1.5 million deposit from the purchaser, but the sale ultimately fell through.  (Martin Dep. at 147-48).

For a finding of repudiation by acts, "a party's act must be both voluntary and affirmative, and must make it actually or apparently impossible for him to perform."  *Paul*, 193 Mich. App. at 494 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 250).  Citynet's agreement with NFiNet was in direct conflict with Citynet's agreement to give Waypoint an exclusive IRU in the Phoenix fiber and rendered Citynet unable to perform its obligations under the IRU Agreement with Waypoint.

Citynet contends that its attempt to sell a portion of its Phoenix assets, including half of the fiber in its Phoenix network, to a third party did not constitute a breach of contract because this action was consistent with Citynet's understanding that the IRU Agreement only involved 50% of the fiber assets in the Phoenix network and because the NFiNet deal collapsed before NFiNet was entitled to receive any fiber from the Phoenix network. In light of this Court's determination above that the IRU Agreement applied to all of the fiber in the Phoenix network, Citynet's contrary belief that it applied to only 50% of the fiber, even if reasonable, would not be sufficient to preclude a finding that it breached the contract. Moreover, the collapse of the NFiNet arrangement does not alter the fact that Citynet's actions in entering into the arrangement were in breach of its obligations to Waypoint under the IRU Agreement.

The unrebutted evidence reveals that Citynet repudiated the IRU Agreement both orally and through affirmative acts that rendered it unable to perform. Accordingly, Waypoint is entitled to judgment on its claim that Citynet breached the IRU Agreement.

## V.

In its motion for summary judgment Citynet contends, in the alternative, that even if the Court finds a valid contract, Citynet is entitled to summary judgment on Waypoint's claim for lost profits because the lost profits computation made by Lisa Snow, Waypoint's expert, is too speculative. In support of this motion Citynet relies on evidence that Waypoint made no sales in the Phoenix and Dallas markets during the first seven months of the IRU

23

Agreement, that Waypoint had no previous sales experience in these markets, and that Waypoint has not lost the opportunity to sell the fiber because it still exists.

Citynet's arguments raise issues regarding the weight to be accorded to Snow's calculations rather than a basis for dismissing Waypoint's claim for lost profits. Accordingly, Citynet's motion for summary judgment as to lost profits will be denied.

An order and partial judgment consistent with this opinion will be entered.

Date:   <u>February 10, 2006</u>          <u>/s/ Robert Holmes Bell</u>
                                        ROBERT HOLMES BELL
                                        CHIEF UNITED STATES DISTRICT JUDGE